is the case is now submitted. And we'll move on to our final argument set for this morning which is NetChoice v. Bonta, Case No. 25-146. Mr. Keller. May it please the Court, Scott Keller for NetChoice. I'd like to reserve five minutes for rebuttal. California's SB 976 violates the First Amendment by requiring parental consent before minors can access personalized feeds, imposing speech-restrictive default settings and mandating age assurance for all users. And two key Supreme Court cases control this case. First, under Brown v. Entertainment Merchants Associations, website users have a constitutional right to access protected speech without parental consent or age gates. Second, Moody v. NetChoice held that personalized, individualized feeds are a distinctive, expressive offering, to quote Moody. And those are protected by the First Amendment, and that includes when websites use algorithms to implement their editorial policies. So, counsel, can I start with standing on specifically, I mean, you really have three, you have personalized, as I understand it, you have three claims here or three provisions, the personalized feeds, the default settings and then the age verification. I wanted to, and then you have an as applied and a facial challenge to each of those. Let's start with the as applied challenge to the personalized feeds. I mean, don't you have to show, doesn't there have to be evidence of how these personalized feeds work in order to actually handle the as applied challenge? I don't think so, Your Honor. And the reason for that is the nature of the First Amendment claim is going to be the same, regardless of how any particular website does content moderation or how it orders or what editorial decisions it's making. We know from Moody, for instance, that even when a website is using editorial discretion, how to order speech based on its community guidelines, its content moderation policies, and it's pairing that with a decision to also order speech based on what the user's preferences and information are. We know that's fully protected. Well, you're jumping into the merits, but I'm asking a standing question for basically an associational standing question where, I mean, NetChoice doesn't have the standing. It's based on your members that have standing here. And you've said, I think in full candor, it has to be, I think is true, that all of your members have different algorithms, different ways in which they do the personalized feeds. I don't understand how the Constitution couldn't or wouldn't apply differently based on those personalized feed algorithms. Well, they all involve human review. And all of these policies, these content moderation community guidelines policies, are publicly available. And if I can cite the court to the record on this, Excerpts 309 to 310 says that these are publicly available community guidelines. Excerpts of 354. Wait, wait, wait. That can't be true. I mean, the algorithms that you use to provide personalized feeds are publicly available? No, the community guidelines, the content moderation editorial policies. Yeah, but that's not what we're talking about. We're talking about personalized feeds. You have an algorithm, as I understand it, correct me if I'm wrong, it's very easy to get out of my comfort zone when you're looking at this. But as I understand it, the challenge is you can't, they're prohibiting personalized feeds so that when a kid or anyone is searching, there's an algorithm that says, okay, you search for this, I'm going to feed you additional information. And everybody has a different algorithm to do that. The algorithms are not public. That's correct. But that doesn't change the First Amendment analysis, regardless of how any website is. Oh, I see. Okay, but you are trying, I was just going to say, bring it back to standing, because I have a separate issue on the merits. And I'm happy to bring it back to standing, but I do think they're interrelated. And the reason they're interrelated, because it's the nature of the First Amendment claim that's being raised. Now, and just to be very clear, the state concedes that we can raise a facial challenge. And so all of these answers right now are going to that. No, I understand. That's implied. Let's move quickly to the facial challenge, because there you seem to have a different problem. And Moody, I think, actually hurts you there. I mean, you have several justices who've written and said the problem with the facial challenge is you have to show that it's unconstitutional in all circumstances. And I don't know how you even do that. Well, no, what Moody said is in a First Amendment case, we have to show that the unconstitutional applications substantially outweigh any constitutional applications. Now, we think we also satisfy the traditional Salerno no-set-of-circumstances test. But what this court said in its previous Net Choice v. Bonta decision was that you don't have to do a granular census identifying every single website that's covered. Rather, what Moody said is it was looking at what kinds of websites might fall on one side of the constitutional line versus the other. I mean, Moody was talking about events management, e-mail, online marketplace, payment services, ride-sharing services. There's no dispute here that those are simply not covered by this law. And so in that scenario, whether it's this court's Net Choice v. Bonta previous decision or its ex-corporation decision. Well, but let me read you from Moody. Justice Barrett says the analysis is bound to be fact-intensive, and it will surely vary from function to function and platform to platform. Justice Jackson says even when evaluating a broad facial challenge, courts must make sure they carefully parse out not only what entities are regulated, but how the regulated activities actually function. Justice Alito says it is impossible to determine whether they are unconstitutional in all their applications without surveying those applications. How do you get around these statements that in order to succeed on that claim, you have to go function by function, platform by platform? Because here in this case, the state's not arguing that things beyond personalized feeds are covered. And so here there's no debate about e-mail or ride-sharing or payment services. Instead, what we're talking about are the exact personalized, individualized, curated feeds that Moody said are distinctive expressive offerings that the First Amendment protects. So Net Choice v. Bonta and ex-corporation, this court's already construed Moody in those cases say that a facial challenge is absolutely proper when the arguments being raised would be the same regardless of what website we're talking about. And that is really crystallized by think about a user that would be accessing one of these websites. Their burden is going to be the same regardless of however a website wants to prioritize, you know, football videos versus cat videos versus political speech. I mean, we're talking about billions of posts of fully protected speech. So regardless of how an algorithm operates, we can raise a facial challenge. We also have the ability to raise as applied challenges. I don't think that really matters here because I think all roads lead to the First Amendment violations. We know from Brown that the state cannot block access to protected speech by saying you need parental consent. We know from Packingham that when you restrict access to social media, that triggers heightened First Amendment scrutiny. And we know from Moody that when the state wants to come in and say you can't do personalized or individualized feeds the way that you want to, company, and we're going to government, the government is going to override your editorial decisions, that that also is a First Amendment problem. Let me ask you this as to, you've talked about heightened scrutiny. It's not entirely clear to me that we should apply strict scrutiny because I read our own decision on Project Veritas as contemplating intermediate scrutiny for a case like this. How do you respond to Project Veritas on that point? I don't think Project Veritas would have applied intermediate scrutiny if there had been, say, content-based exceptions for consumer reviews in that recording. Because here we have not only – We've got a couple of things on which you're arguing, but it depends. One is the consumer-based reviews, and the other one is the solicitations. I get that, but I'm not sure I read Project Veritas the same way you do. Project Veritas very clearly says just because there's some touching on what's in there that that automatically means strict scrutiny. And you've got a pretty slender read upon which you're, I think, relying here as to why strict scrutiny is triggered. Well, Your Honor, let me give two responses. One, I don't think it matters. I think we win anyway. But two, to take the question head-on, I do think this law is all about regulating content. When the state comes in and says we want to regulate personalized feeds, what we're talking about are feeds that are giving users the most engaging speech that they want to see. Well, no, not that they want to see, that your clients want them to see. Well, Your Honor, I think this is a back-and-forth about when a user creates an account and a user on these various websites then has a personalized feed that is curated. That can be based on, yes, the community guidelines and the editorial policies of the websites. That can also be based on user information. Yes, but what your clients are after is not responding to requests by the user. What your client is after is giving to the user what your client wishes to provide to the user. And I don't think there's any First Amendment problem with that. I understand that, but I don't like to mischaracterize who wants what. Well, I think it can go both ways, Your Honor. And we know from Moody that when there are personalized feeds, that that's protected. And also, to come back to the intermediate versus strict scrutiny point, I don't think it matters. Take Brown. If Brown had said you need parental consent to get any video game and not just a violent video game, I think that just makes the law worse and there's going to be a lot more First Amendment problems. Take Packingham. That was an intermediate scrutiny case. Moody itself said we don't have to decide if strict scrutiny or intermediate scrutiny applies because the law fails anyway. I thought your best argument for a strict scrutiny under the case law was not, you know, the personalized feed being content-based, but that there was an exception where it only if they were dedicated to commercial transactions. Yeah. I agree. And just in response to Judge Fletcher's question of an additional argument, but I agree. I think the fact that this has exceptions for commercial transactions and consumer reviews and also— I mean, that seems to me to be— I mean, I guess if California went and amended the law and said, okay, we're going to do it across the board, then all these other issues come into play. Yeah, we could talk about that, too. But I think there's also another content-based distinction, which is website-generated content as opposed to third-party or user content is also treated differently by this law. And this also goes to why this law is very under-inclusive. It doesn't include all personalized feeds, you know, Spotify or Hulu making personalized recommendations. That's fine. But yet when YouTube wants to present very, very similar content and videos, it can't. So far we've been talking about this without mentioning the fact that we're talking about kids. Is the analysis at all affected by the fact that we're talking about kids rather—minors rather than adults? I don't think so, Under Brown. And the reason is because the state can't come in and say that a minor doesn't have the right to speak or be spoken to. I mean, we wouldn't think, for instance, that a government can impose parental consent to access a library card catalog or a curated community bulletin board. You know, from Erzon—excuse me, Erznozik back in the 1970s from the Supreme Court, that minors have constitutional rights. Well, I understand that, but you're saying there's no distinction whatsoever and it needs to be drawn from the fact that we're talking about minors? You say it's entirely irrelevant? Your Honor, I don't think that it is entirely irrelevant. I think that the binding precedent of Brown provides that the state can't require parental consent. Now, what this court— But wait a second. I mean, clearly children have different First Amendment rights, even under our current law, than adults. I mean, we recognize that in the school context all the time, that there can be greater regulation in the school context for minor children. So, I mean, just following up on Judge Fletcher's point, I mean, it may not—I don't know if that's a winner argument for the state. But I think you have to recognize that minors have different First Amendment rights. Well, Judge Nelson, in the context of schooling, we would—of course that could be different. But it's not just the schooling. It's also the fact that they're underage. Well, when it comes to schooling, I think that line of case has been distinguished. We're talking about private citizens on the private— But if you go to schools, if you go to universities where you're not dealing with minor children, then the First Amendment rights are different. So it's not just whether it's school or not school. It has to do with their basis as children, I think. And what Brown tells us is that the state doesn't have the authority to come in and tell what minors can be spoken to or how they can speak. I don't think it goes so far as that. I mean, you would read this to say minors are adults. I mean, I haven't quite said that, but in effect, I think that's what your argument is. Your Honor, I'm not saying that. I think this goes to the scope of First Amendment rights. For instance, we wouldn't say that government can ban Saturday morning cartoons simply because they think that they're too addictive. And that's another aspect of this case. Coming in and saying we're going to slap the label addictive on speech that users really want to engage with— That actually is addictive. You sound like the tobacco companies. Your Honor, absolutely not. And there's two responses to that. One, we're talking about speech here. We're talking about fully protected speech. We're not talking about a substance that is a carcinogen. And second of all, the record in this case, if I could point the court to it— It might be actually worse than a carcinogen. I mean, what we're doing to the future generation, I think—I mean, I know that that's not at issue here, but, I mean, we got an entire— There's a problem here. Are you saying that the state—let me ask you about the compelling state interest. Are you saying that the state does not have a compelling interest in protecting children from addictive behavior? Your Honor, what we are saying is, well, just what Brown said. What the state has the power to do, it can protect minors, but they can't do that and satisfy that interest. I understand that, but you—so you're not disputing that there's a compelling state interest here. If we go with you on strict scrutiny, you're not denying that the state has a compelling state interest here. You're attacking the least restrictive means portion of the analysis. No, we are attacking the government's interest because the government here is trying— what the government essentially is trying to do is prevent harm from protected speech. I don't think there's any basis to do that. Wait a minute. The government's trying to protect harm. You characterize it as protected speech. The government does not characterize it that way. They do, and I think they're very wrong about that for Moody and Packingham and Brown. These are personalized fees. This is speech. If I can also, before I sit and reserve the rest of my rebuttal time, I'd like to address the evidence the defendant has cited because it is inconclusive. It doesn't address personalized fees specifically, and it establishes correlation at most. Their declaration, this is Excerpt 177, says, The Surgeon General found social media has both positive and negative impacts on children and adolescents, and these impacts vary based on individual differences between children and based on context. That same Fetter declaration at 178 concedes studies finding on social media use are not consistent, and some find no association between social media use and mental health problems. We would submit that when we're talking about billions of posts of fully protected speech, that that is not sufficient at all for the government to come in and override First Amendment rights. If I could reserve the rest of my time for rebuttal. Thank you. Good morning, Your Honors. May it please the court. My name is Chris Kissel, and I'm representing the attorney general of California. The district court did not abuse its discretion when it denied NetChoice's request for a preliminary injunction. There are several reasons why that's true. First, the district court correctly recognized that SB 976 addresses harms caused to minors by the addictive features of online platforms. This statute does not restrict minors' access to content, and it does not restrict companies' ability to exclude content that disfavors. Here's where, under our current case law, I think you run into a little bit of a problem, which is you do distinguish between commercial transactions and consumer reviews on the one hand and other content on the other hand. And if you look at Discovery Network, the Supreme Court said you can't distinguish between, say, newspapers and handbills. That's content-based. So I don't understand how this isn't content-based based on the current Supreme Court precedent. It's not content-based because the distinction that Your Honor is referencing between commercial websites and other kinds of websites is not a distinction that's made on the basis of content. It's not a distinction that's made on the basis of ideas. Sure it is. I mean, you can go to Facebook Marketplace and you can get addicted to Facebook Marketplace and spend all your parents' money, but you can't get addicted to kitten videos on YouTube. Well, the distinction, though, is based on – Well, go ahead. Well, I actually – I would point the court to the Project Veritas case, the recent en banc case, because I think that that provides the explanation that's key to understanding when a law becomes content-based. And that's because either on its face or in its purposes, the law has to be targeting particular ideas or messages. No, that's not true. You're talking about viewpoint discrimination, and that's different than content-based designations. Well, not simply viewpoints. I mean, that is what viewpoint discrimination is. But also, I mean, what Project Veritas says is when those distinctions are made, basically in raising the risk that there are ideas or messages that will be removed from the marketplace of ideas because the government has some purpose of removing those ideas from the marketplace of ideas. And so if the distinction is made because there are legislative findings, facts about the harms that are caused to minors, that it's these user data-generated functions that are causing children to become – to have these habit-forming effects. And there are certain websites that don't have those harms. Then distinguishing between – But what does that mean? I mean, they've made a decision that Facebook marketplace is not addictive? Because I think there's a little more jaded analysis, which is commercial interest came in and got an exclusion here. I can't speak to that. I know. But I mean – but that's the whole problem with the content-based distinction here. I mean, I think if California had come in and said all feeds, regardless of the nature, are prohibited, I think California would be on much more solid footing that this should be subject to intermediate scrutiny. It's the carve-outs that create a problem here. Well, the fact that there are carve-outs, I think the court should see that as an effort to narrowly tailor this statute at the features that the legislature determined are causing this harm. And so if the legislature determined that children are not on eBay at 1 o'clock in the morning scrolling through lampshades, but instead it's these sites that have – that are using their user data otherwise that are not subject to that exception, then that's only showing that the statute is narrowly tailored at the harms of the website. If we were to conclude that the provisions based on commercial transaction and consumer reviews are invalid, there's a severability provision at the end. So what do we do with that? How's that going to operate? Do we just take that out and the rest of the statute stands? Yes, that's what I would suggest, if that – the inclusion of that exception renders the statute unconstitutional. Because there is a severability at the end of the statute. Yes. But can – I mean, that's interesting. I only thought about severability in the context of the three different provisions at issue. Is it severable – I mean, can we actually do that? Can we actually redline a content-based – I mean, to me that feels like we'd be rewriting the statute and saying, well, if you had actually gone past a constitutional statute, we're going to rewrite it so it's constitutional. I don't know if that – I mean, but your position is we have the authority to do that. Well, let me just read you the severability provision. If any provision of this chapter or application thereof to any person or circumstance is held invalid, that invalidity shall not affect other provisions or applications of this chapter that can be given effect without the invalid provision or application. And to this end, the provisions of this chapter are declared to be severable. So under that provision, I would say yes. If the Court sees that portion of the statute as being the impediment to constitutionality, the Court should do that. I would just emphasize that, as I said, it really just shows that what the legislature was doing was being attentive to the particular harm. I understand. I mean, the legislature is trying to deal with a real problem here. What – let's say we agreed with you that there's no associational standing, just hypothetically. I mean, I don't know. These are complicated issues, so I don't want anything I say to indicate a decision. But hypothetically, if we agreed with you that there's problems with standing on the as-applied challenge and problems with the merits under Moody for the facial challenge, is there benefit in lifting the – right now there's a stay pending appeal on that issue. Would there be benefit to temporarily lifting the stay on that issue, even if we keep the stay in – the stay pending appeal in place on, say, the – on the default settings issue? I'm sorry. Lifting the stay for the purpose of – Lifting the stay on the – right now there's an injunction pending appeal on all – the entire act. Yes. If we thought that there's at least a possibility that we would uphold in some fashion the personalized feed, would there be some benefit in going out before we issue a decision and lifting the stay pending appeal? Yes, I think the benefit would be allowing the state to enforce the statute. I mean, I think – And you could do – you could do – I mean, going back to the severability provision, you could do that as to the personalized feed separate and apart from the default settings. I don't see any reason why that would hinder the state from enforcing those provisions. And I think every day that the state is not able to enforce those provisions is a day that the state is not able to address these important harms. So I would say, yes, that's possible. I have a question. Last night I reread Judge Davila's opinion. And I get to the very last paragraph. I'm sure you're familiar with it. Those sides are. And he says something like, this case came on very quickly. It was expedited to our level, the trial court level. We know it was expedited to us. And then he says something like this. Things that are currently enjoined may not be enjoined. Things that have not been joined may well become – may become enjoined. What do you take from that? What do you think he meant? If we're talking – if we're thinking about the same part of that order. It's the very last paragraph of the order. I think Judge Davila was recognizing, rightly so, that these are complicated First Amendment issues. That the more we talk about them and read the court's precedents and listen to what the Supreme Court has had to say, that we understand the issues better. I don't agree with the idea that the conclusion should change because our position has stayed the same. Well, let me tell you how I read it, as I've only been doing this for 30 years. I read Judge Davila saying this is sort of interlocutory in nature. It's temporary in nature. I haven't heard everything I need to hear to reach a conclusion about the enforceability or non-enforceability of this particular statute. And that tells me he anticipates hearing more. Am I wrong in that? No, no, not at all, Your Honor. On that score, I think the state would emphasize that point that you made because I think it's important that this is on an interlocutory posture. Because what it means is there hasn't been an opportunity for full discovery. So we don't know how these feats actually work, which is crucial to applying the First Amendment standards and understanding what this statute would do in application. And so for that purpose, I mean, I would absolutely agree. You know, we had two or three weeks to assemble an evidentiary record to defend the statute. And I think that's important for the court to recognize that this is an interlocutory posture. One of the points the net choice parties make is that there are less restrictive measures that California could have undertaken. Has that been flushed out? I could ask that of your friend on the other side. No, I don't think it's been flushed out in the sense that we don't have evidence in the record about every alternative that exists. I think that would be important for the ultimate analysis. But in terms of the alternatives that no choice is pointed to, none of those do what the statute does. I mean, a lot of them, maybe all of them would restrict access to these platforms altogether, would restrict access to the Internet altogether. You know, there are certainly parents out there who may not want to completely restrict access to social media or completely restrict access to the Internet. And what this statute does is it gives those parents a tool to just control the most addictive aspects of these platforms. And that's why I think, you know, on the current record, net choice hasn't made the showing that that would render the statute unconstitutional. But to get back to the answer, yes, I mean, there are many aspects of this case that I think are very factually based. And I think that matters when the court. Can I ask about the least restrictive means? Because there, I think you run up against our prior opinion and the prior net choice versus bond opinion where, I mean, I would have thought least restrictive means were things that the government. You know, could do that was less restrictive, but our decision there seemed to look at, well, you could just do educational programs or parents could become more involved. I mean, whether we agree with our prior decision, aren't we sort of bound by that to say that, you know, there are less restrictive means that we've already recognized than what California has done here? So if we go to strict scrutiny, doesn't that become a problem for you? And how would you address the net choice versus bonded prior decision? Well, if the issue is. You know, are there conceivable government alternatives to regulating in this way? I wouldn't disagree that that would be part of the analysis on strict scrutiny. What I would disagree with is that there have there has been any indication in the record here that there are government alternatives that would be less restrictive. I don't think there are government alternatives that be less restrictive. I think that the thing about this statute that, you know, that is worth emphasizing is just how carefully tailored it is to the harms. Because, as I said, it doesn't you know, there are a lot of laws out there. You know, a lot of states are addressing this issue. Obviously, it's an issue of paramount concern. And I don't know that there are a lot of other statutes that go out of their way to say we're going to make sure all of the content is still available to children. We're going to make sure they can still use these platforms. We're going to zero in on what is the most harmful aspect of these platforms. And that and rather than fully, you know, rather than restricting access to that, to those functions, it allows parents to make the decision for their families to make those functions available if they want to. So it really is, I think, the most hands off approach that the government can take while being proactive about addressing this problem. Can I ask a question you may not be prepared for and if you aren't, that's fine. But it's on my mind. The Supreme Court has gone to history and tradition and a lot of other constitutional provisions. First Amendment, free exercise clause, establishment clause, Second Amendment, Eighth Amendment. It hasn't done that in free speech area yet. Would California have stronger arguments that this statute was constitutional if we looked at a history and tradition analysis of the of the free speech clause, as opposed to what our current Supreme Court precedent is? I don't think the state would have stronger arguments. I think the history and tradition, to the extent that I'm familiar with it, I'm also not a First Amendment scholar, but to the extent that it's related to individual expression and democratic participation. And the idea that speech is the embodiment of ideas that a person has in their head that they can then point to the speech as embodying those ideas. I mean, those are I would I would say are our First Amendment first principles. And I think they all support this law, because the end of the day, if the main question in terms of whether there is a First Amendment impact is to what degree these functions that are regulated are expressive or embody expressive choices. And the question is going to be, you know, what what are the expressive choices? Where are the expressive choices taking place? I think that the first principles would support that. But I, I know that the Supreme Court precedent also supports that, because when you look at Justice Kagan's discussion in Moody about what does a platform. What what are the sort of protected characteristics of what a platform does? Justice Kagan was talking about, you know, the editorial discretion to exclude ideas that the platform wants to exclude and that in doing so, the platform's policies embody expression. And here we're talking about a different function. And the court has said, even in footnote four of Moody, that expressive functions and non-expressive functions can be looked at and should be looked at separately. When we're talking about the function that's regulated by this statute, we're talking about something that basically just reacts to a user's preferences. And in that respect, the First Amendment considerations are different because we have to locate. Well, if there's an expressive choice, which you don't think there is, where is that expressive choice made? Where is the expression? Is it's a platform doing the same thing in terms of is it excluding the ideas that it disapproves of? Well, not if it's just mirroring the user's preferences, not if it's just making some algorithmic calculation of what the user wants to see and reflecting it to them like a mirror. That's not an expressive choice. On a second question, I think Justice Barrett's concurrence, and of course, Justice Barrett was one of the five justices who was part of this sort of substantive discussion as applied discussion that Justice Kagan undertook in Moody, explains that if these choices are made by artificial intelligence algorithms, that not only they're not executing policies, they're actually making their own determinations based on probabilities about a user wants to see. If those are the choices that are being restricted, those aren't the kind of choices that the First Amendment protects. And to your honor's point, the founders certainly I mean, there's a lot of things about modern society. Of course, the founders did not predict. But I don't think the founders would have said that the First Amendment protects a choice that is really not a choice that was made made by a human being. It was made based on an analysis of some criterion. And I know that these artificial intelligence algorithms are complex, difficult to understand, which is another reason why discovery would be helpful. But that if they create their own criteria for these decisions, then it's impossible to say that these are the kinds of decisions that are protected under the First Amendment. And so I guess in 20 seconds, I mean, you don't have to use it. You can use it whenever you want. I'll I'll let it go. OK. Thank you. Thank you for your argument. We'll give you rebuttal then. Thank you. Three points in rebuttal. First, about the preliminary injunction posture. Second, about what Web sites are doing to protect minors and give parents tools. And finally, just that the state's position here would overhaul the social media companies. And if you could and if you could also address severability. Happy to address severability. Judge Hawkins, I think the preliminary injunction posture here is absolutely how this court should think about it. And I think Judge Davila's opinion shows that these are weighty issues. These are novel issues. And what we have to do is show is there a colorable First Amendment claim here? I think we have. We've done well, but that's not true. You have to show likelihood of success on the merits. And this court sliding scale showing a colorable First Amendment claim and likelihood of success on the merits, I think, is part of the colorable First Amendment claim. But when we come forward and we have a courts across the country that have been joined parental consent and age verification laws. And again, at this posture, if there needs to be more record evidence, I would submit that when we're talking about heightened First Amendment scrutiny, it's the state's burden to justify that there are that they are able to restrict speech. And so we have submitted declarations that show that these would overhaul Web sites, that also that these would impose substantial compliance costs. And the state essentially hasn't rebutted that. Instead, it said the First Amendment just doesn't apply. If I could address on severability, our submission is that that wouldn't fix the law. There would still be constitutional deficiencies. And regardless, I think that would be redlining the statute. And if the legislature wants to try again, I think you would have to do that in severability clause specifically invites that it does, Your Honor. And I think when we're talking about the First Amendment and seeing that this is all about restricting speech, I think that goes to the government's interest in the tailoring. My question more on the severability is, is there a difference between I mean, I think the severability clearly applies as to, you know, personalized feeds versus default settings. Like we could come to different conclusions there and one could go forward without the other. But with I mean, can we rewrite a statute to make it constitutional? I mean, that almost seems like taking a legislative authority to say, well, this is what you should have done. We're going to help you out. I completely agree, Judge Nelson. And if I can turn to the parental tools, which are a key. Let me ask you this in a different way. If and this is a hypothetical. If we were to conclude that the provision of the statute that is addressed to commercial transactions and consumer reviews is unconstitutional. And we were to take that particular provision now because it's very discreet. Is that permitted by the severability clause? Our submission is it's not. Given the First Amendment challenges we've raised, there would still be constitutional problems. It wouldn't solve the fact that that's not quite my question. Does the severability clause tell us that we should take that out and then analyze the statute as to its constitutionality without that provision? In the context of a First Amendment case, I'm not sure that it does. And if the state and the legislature were going to have a different. Why is that so? Because in the context of raising First Amendment claims, you have both the rights of websites and users. The fact that just redlining consumer transactions and consumer reviews wouldn't solve the problem that they're still content based. The signature websites, if we redlined consumer reviews, wouldn't we effectively be putting them into the purview of the statute? I mean, that seems to be the problem is we're actually I mean, we have no idea what the legislation. That's right. And I think this entire exercise is what would the legislature have done in this hypothetical world? And I don't think the court has anything before. And I don't think the state has said they have. And if I can turn to the parental tools, because here, Net Choice members, websites provide parent and devices and networks and routers all provide tools that parents can control their minors online experiences. And the state even says that these tools are more restrictive than SB 976. I think that is a key part of this case. Net Choice members, websites are trying to protect minors. In fact, there's evidence in this record, the excerpts of 325, that they have personalized feeds specifically because this is the main tool to safeguard minors online to prevent them from getting bad speech. So in talking about these problems, these novel weighty issues, our submission is the preliminary injunction should remain in place. We have satisfied the court standard for that. We've presented record evidence that this would overhaul these social media websites. And if the state wants to take additional discovery throughout the rest of this case, that is, of course, how the normal process would play out. But before this court would go the opposite way with the consensus of courts across the country that have invalidated parental consent laws and age verification laws like this, we would ask that. And again, before even Judge Davila is recognized that this would fundamentally reorient social media websites, we'd ask that the court keep would ask that the court reverse the partial denial of preliminary injunctive relief and allow the case to proceed with the injunction in place. Thank you. Thank you to both counsel for your very professional arguments in a very complicated case. Your assistance to the court. The case is now submitted and the court is adjourned for today.
judges: HAWKINS, FLETCHER, NELSON